UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK
--------------------------------------------------------
IN RE:

      UNI IMAGING HOLDINGS, LLC,          CASE NO. 08-61716


                     Debtors         Chapter 11
--------------------------------------------------------
APPEARANCES:

MENTER, RUDIN & TRIVELPIECE, PC      JEFFREY A. DOVE, ESQ.
*Attorney for Debtors*
308 Maltbie Street, Suite 200
Syracuse, New York 13204-1498

BENANTI & ASSOCIATES          JANE W. ARNONE, ESQ.
*Attorney for Philips Medical Capital, LLC*
350 Bedford Street, Suite 201
Stamford, Connecticut 06901

Hon. Diane Davis, U.S. Bankruptcy Judge


**MEMORANDUM-DECISION, FINDINGS OF FACT,
CONCLUSIONS OF LAW AND ORDER**


      Under consideration by the Court is a motion filed on October 13, 2008, on behalf of Uni

Imaging Holdings, LLC (the "Debtor") seeking to modify the requirement for timely performance

set forth in § 365(d)(5) of the U.S. Bankruptcy Code, 11 U.S.C. §§ 101-1532 ("Code"), as well as

a determination that certain contracts between it and Philips Medical Capital, LLC ("PMC")

constitute secured transactions, rather than leases (Dkt. No. 35) ("Motion 1").  Opposition was filed

on behalf of PMC on October 23, 2008.

      The motion was heard at the Court's regular motion calendar in Utica, New York, on

October 28, 2008.  Following oral argument, the Court determined that it would be necessary to

schedule an evidentiary hearing.  The evidentiary hearing was originally scheduled to be held on

2

December 15, 2008, but it was adjourned to January 14, 2009, on the consent of the parties.   At a

hearing on January 13, 2009, concerning Debtor's motion to compel responses to interrogatories,

the Honorable Stephen D. Gerling indicated that he was not going to conduct an evidentiary hearing

until the discovery dispute between the parties was resolved.  According to the case docket, several

further adjournments were sought in an effort to resolve the discovery issues. (Dkt. No. 80).

On March 13, 2009, the Court issued a Notice of Status Conference to be held on April 28,

2009.  In the interim, on April 10, 2009, PMC filed a motion to compel timely performance by the

Debtor of "all obligations under a certain lease agreement, to compel Debtor to assume or reject a

certain lease agreement, for relief from the automatic stay, for adequate protection and for payment

of administrative expenses; or in the alternative for conversion of the case to a chapter 7

proceeding."  ("Motion 2") (Dkt. No. 82).  The Debtor filed its objection to Motion 2 on April 23,

2009.

In a letter, dated April 24, 2009, PMC requested that the Court again schedule an evidentiary

hearing to address the motions pending before it (Dkt. No. 86).  The Debtor responded in a letter,

dated April 27, 2009, agreeing to an adjournment of both Motion 1 and Motion 2 to another motion

calendar until its discovery demands could be resolved (Dkt. No. 87).

On June 25, 2009, the Court heard arguments on the Debtor's motion to compel responses

to interrogatories.  An agreement was reached by the parties at a status conference conducted that

same day and an Order was signed on July 22, 2009, scheduling the evidentiary hearing for July 31,

2009 (Dkt. No. 99).  Following the evidentiary hearing, the Court afforded the parties an opportunity

to file post-hearing memoranda of law, and the matter was submitted for decision on August 28,

2009.

## JURISDICTIONAL STATEMENT

The Court has core jurisdiction over the subject matter and the parties of this contested matter pursuant to 28 U.S.C. §§ 1334, 157(a), (b)(1), (b)(2)(A) and (O).

## FACTS

Debtor was formed in October 2005 for the purpose of providing magnetic resonance imaging ("MRI") equipment to Academic Medical Imaging, P.C. ("AMI"). AMI allegedly was to make payments to the Debtor based on the number of scans it performed using the MRI equipment. According to the Debtor's Statement of Financial Affairs, Oneonta Diagnostic Imaging, LLC ("ODI") holds a 60% membership interest in the Debtor, and The Mary Imogene Bassett Hospital ("Bassett") holds a 40% membership interest. ODI is owned by Stanley Malkin, M.D. ("Dr. Malkin"), a board certified neurologist, and Ullrich Klamm, Ph.D ("Dr. Klamm").

Dr. Klamm testified that he was primarily responsible for negotiating the contracts, which are the subject of this motion, on behalf of the Debtor. (July 31, 2009 Transcript ("Tr.") at 63 and 64). The first proposal from Daniel Thomson ("Thomson"), on behalf of PMC, was sent to Dr. Klamm via e-mail on April 18, 2006 and dated April 17, 2006. *See* Debtor's Exhibit 4. The e-mail indicates that the proposal was based on a price of $1,349,743.00 for the equipment, which is the subject of this decision. A balloon payment "at lease end" was set at $175,000.00. *Id.* The agreement is identified as a "Capital Lease" for an Achieva 1.5T MRI System ("Achieva"). It was Dr. Klamm's testimony that he was

adamant about making it a capital lease because my experience shows that if you do it on a fair market value that you essentially make your payments until the thing is

paid for, and then at the end the fair market value which gets determined by the manufacturer means that you, in essence, have to buy the equipment twice.

Tr. at 64.   Dr. Klamm went on to explain that he "definitely wanted a capital lease, but in order to reduce the payments I requested that we have a balloon payment at the end of the loan."  Tr. at 65.

The first proposal refers to an offer of "financing" and then identifies a "lease term" of sixty months with "rentals" being paid on a monthly basis.  The document also provides for no payments for three months, followed by sixty payments of $27,549.43.  At the end of the term, the Debtor had the option to purchase the Achieva for $175,000.00.  On cross-examination, Dr. Klamm explained that "[y]ou always try to get a balloon, so that you have fixed payments with a balloon payment at the end in order to alleviate the cash outflow in the earlier period.  Typically, you don't get balloons, and so then you settle for a dollar buyout."  Tr. at 77.   He testified that "[t]he only time you get balloon payments is with manufacturers in my experience.  That a leasing company or a bank typically will not agree to balloons."  Tr. at 87 and 95. The Debtor was also required at its own expense to "provide insurance and pay all fees, property, sales and use taxes and other expenses of a similar nature."  *Id.*

By e-mail from Thomson, dated April 20, 2006, two different proposals were submitted to Dr. Klamm.  Debtor's Exhibit 5.  The first, identified as "Capital Lease with FPPO ('fixed price purchase option')" provides for three payments of "$0" and then three payments of $8,851.98, followed by sixty payments of $25,275.73.  The "end-of-term option" remained unchanged from that of Debtor's Exhibit 4, namely, the purchase of the equipment for $175,000.00.

Also attached to the e-mail of April 20, 2006, was a document identified as "Fair Market Lease."  *Id.*  According to Thomson's e-mail, "[t]he residual we would book on the FMV/operating lease will be 18%.  *See* Debtor's Exhibit 5. It provides for sixty payments of $24,353.84, rather than $25,275.73, and included three "end-of-term options" including purchase of the equipment for fair

market value not to exceed 22.5% of the equipment cost ($328,742) at the end of the sixty-six

months; renewal of the lease for an additional term; or return of the Achieva to PMC. *Id.*

Dr. Klamm testified that the latter proposal, identified as a fair market value lease, "didn't

make sense because it was capped at 22.5 percent and, you know, the industry is full of horror

stories of people who enter fair market value leases and then end up paying [for] the equipment

twice." Tr. at 68. When asked on cross-examination why he had not executed the document

identified as a "Capital Lease with FPPO" in April 2006, he explained that he was not in a position

to sign any agreement until his relationship with General Electric concerning a "GE machine" in

place at Debtor's facility in Oneonta, New York, had been resolved. Tr. at 82 and 94. "That

occurred in late May, early June [2006]." Tr. at 82.

The proposals were reviewed by Carmen Mazzotta ("Mazzotta"), who was described as a

"very savvy leasing expert" retained by Bassett. Mazzotta noted in an e-mail, dated June 6, 2006,

addressed to Nick Nicolleta ("Nicolleta"), Corporate Vice President and Chief Financial Officer of

Bassett, and copied to Dr. Klamm (Debtor's Exhibit 9), that the proposal identified by Thomson as

a "Fair Market Lease," included a return option and a lease renewal option.[1] Debtor's Exhibit 9.

He states, "[t]his addition gives UNI additional flexibility to return the equipment instead of paying

the $175K balloon price at the end of the lease term. . . . this change makes sense if the plan it [sic]

to purchase the equipment at the end of the lease term for the $175K balloon. If UNI plans to return

the equipment, then we can get a lower monthly lease rate factor but the purchase at the end of the

lease will be much higher." *Id.* He goes on to state that

> [y]ou have the additional option of just returning it if new technology is developed
> over the next five years or if you decide to get out of the business. Since these

---

[1] Dr. Klamm testified that the cost of extending the lease for an additional twelve months
was assumed to be $25,000 per month or $300,000 per year. Tr. at 73.

machines are upgradeable, most MRIs stay in place for more than 5 years.  However, if you really believe you will return it after five years, then we should discuss getting a FMV proprosal.

*Id.*  Dr. Klamm went on to testify that to return the equipment was "obviously absurd" and "irrelevant" to the discussions.  Tr. at 92 and 93.  According to Dr. Klamm's testimony, he considered the ability of the Debtor to return the equipment at the end of the contract to be totally unimportant since the Debtor intended to purchase the equipment ultimately for its own use or to turn around and sell it.  Tr. at 96.

PMC offered the testimony of Patrick Hiney ("Hiney"), Director of Asset Management for PMC.  Hiney explained that in that position he was in charge of the department "that prices the residuals on all leases that Philips Medical Capital enters into."  Tr. at 98.  He testified that he had been pricing the residuals for over five years and had been managing the department for approximately two and a half years as an employee of De Lage Landen Financial Services Inc., the primary equity holder in PMC.  *Id.*

Hiney testified that he had authorized the pricing and structure options proposed by Thomson in 2006 to the Debtor in connection with what Hiney described as a "FMV vanilla lease."  Tr. at 100-101.  He explained that the 22.5% referenced in Debtor's Exhibit 5 and identified as a "Fair Market Lease," represented what the customer would pay PMC at the end of the lease if it opted to purchase the equipment.  Tr. at 102.  It was his testimony that the cap, namely the 22.5%, was "materially higher than the residual value the finance company would assume on their actual books."  In the case of a fixed price purchase option, he testified that he looks at the estimated projected wholesale value and prices it above that.  Tr. at 103.  He testified that the fixed price purchase option in this case was $175,000.00, which was around 13% of the original cost of the Achieva at five and one half years.  Tr. at 104.  The fixed price purchase option was estimated to be $145,000.00 when

projected out six years.  It was Hiney's testimony that he had calculated the expected wholesale

value of the Achieva if returned by the Debtor "might have been 11 or 12, or ten" percent, projecting

out five and a half years into the future.  Tr. at 104.  He explained that the wholesale value was what

he anticipated PMC would be able to realize upon the sale of the Achieva in the broker market

should the Debtor opt to return it.  Tr. at 105.

According to Hiney, when pricing for six years in the future on the Achieva, he took into

account the expected wholesale value of the equipment on a fixed price purchase basis, basically the

expected wholesale value of the equipment, should the customer decide to return the equipment.

Tr. at 116. He testified that "you're trying to price the deal such that the customer, if they want the

option to return, can also treat the deal as a tax lease which means you have to be at risk which

means the residual has to be above the expected wholesale so it's not a bargain."  Tr. at 117.

Accordingly, he testified that neither the $175,000.00, nor the $145,000.00 figures were considered

bargains.  Tr. at 118.

On cross-examination, Hiney explained that a fixed price purchase option is a form of a fair

market value lease.  It is "[a] fair market lease that is priced with an expectation of profit to the

lender at the end of the lease where the customer chooses to buy the equipment."  Tr. 118.  It is

"normally priced with a higher residual than one where the lender has no expectation of upside

should the customer choose to buy the equipment.  However, if the wholesale is below the fixed

price purchase option it is a lease."  Tr. at 118-119.  Hiney testified that the 18% figure in the fair

market lease represented the residual that the leasing company would put on its books, not the

buyout.  The buyout that was quoted was the 22.5%, i.e. "the maximum the customer would pay if

they choose to exercise their right to pay for the equipment - to buy the equipment at end of lease."

Tr. at 119.  He acknowledged on cross-examination that "the purchase price on a fair market value

option according to this machine will not exceed $328,000.00." *Id.*  He testified that "[a]t the six-year term the buyout would've been $145,000.00." Tr. at 120.  He explained further that "[t]he $145,000.00 is the fixed price purchase option that was quoted at a 72-month term. The 22.5 percent was the fair market value cap that was offered for a 66-month term." *Id.*  He also acknowledged that neither the 18 nor the 22 percent numbers were implicated in the deal that was ultimately signed by the parties in this case.  Tr. at 121.

The testimony of Anthony Pinardi ("Pinardi") was offered by the Debtor as that of an expert "in the field of buying and selling used medical equipment, deinstallation and financing options . . . ."  Tr. at 15.  On *voir dire* by PMC's counsel, Pinardi acknowledged that "[t]here's no formula for what a piece of equipment is actually worth at the end.  Generally, we base it on the market, what the market is willing to pay for the equipment . . . ."  Tr. at 18.  On direct, Pinardi testified that for a high end unit such as the Achieva, he would view a 10% residual value as a "bargain."  Tr. at 23.  He was of the opinion that a machine such as the Achieva was likely to "bring" 20% or better residual at the end of five years and acknowledged that a 22% residual was a reasonable number for the Achieva.  Tr. at 23.  He further testified that after making certain inquiries he was of the opinion that the Achieva was currently worth about $550,000.00.  Tr. at 24.  On cross-examination, he explained that at that time there were two comparable machines on the market.  One was a 2004 Achieva 8 channel MRI with an asking price of $356,000.00.  The other was a 2007 Achieva 16 channel MRI with an asking price of $565,000.00.  Tr. at 33.

Pinardi also gave testimony concerning deinstalling equipment such as the Achieva.  He explained that the machine would first be tested and then shut down, after which riggers would be brought in to lift up the magnet and put it on rollers.  Tr. at 26.  They would then use a crane or some other device to remove the equipment from the building.  He estimated that the average cost would

run between $10,000.00 and $15,000.00 to deinstall the equipment and shipping usually ran from between $3,000.00 and $5,000.00. Tr. at 27. On cross-examination, Pinardi acknowledged that the cost to deinstall the equipment might be higher depending on its location in the building and what was required to actually get it out of the building. Tr. at 30. He acknowledged that a recent deinstallation of similar equipment had cost approximately $21,000.00. *Id.*

The offer the parties finally agreed to is found at Debtor's Exhibit 9, dated June 2, 2006, which was signed on behalf of the Debtor by Dr. Klamm on June 7, 2006.[2] The term was for sixty-six months and was to begin "when the equipment is made available for first patient or clinical use." It required three payments of "$0" and three payments of $9,544.27,[3] followed by sixty monthly payments of $28,757.55. The "end-of-term options" included purchase of the equipment for $175,000.00, as well as the option to renew the lease for an additional term or to return the equipment to PMC. Dr. Klamm testified that it was the Debtor's intention to buy the equipment at the end of the sixty-six months on the assumption that "at the end of the 66-month term [the value of the equipment] would probably be in the mid-300s and we could buy it for $175,000.00 . . . ." Tr. at 74.

What is identified as the "Master Lease Agreement," dated June 30, 2006 (Debtor's Exhibit

---

[2] Dr. Klamm identifies himself as the President of ODI and Managing Member of the Debtor.

[3] According to Dr. Klamm, skipping the three months of payments and then making interest only payments for three months "is a very prudent and normal thing to ask [for]' in order to be able to build up the business and the cash flow needed to make the monthly payments. Tr. at 89. In addition, the monthly payment was to be tied to like-term U.S. Treasury rates. As of June 2, 2006, the monthly payments were calculated at 5.02%. However, as of September 27, 2006, the rate had decreased to 4.55% or $8,612.98 per month. *See* Debtor's Exhibit 2. According to Debtor's Exhibit 2, the payment of $8,613.00 was due the first month and then no payments for the second through fourth month, with payment of $8,612.98 for the fifth and sixth months and then monthly payments of $25,316.75 for the seventh through sixty-sixth month of the contract.

2), was executed on behalf of PMC on October 4, 2006. According to its terms, Debtor was required to make no payments for the first three months, followed by three months of payments of $8,613.00 per month, and then sixty monthly payments of $25,717.56. Dr. Klamm testified that the installation of the Achieva was begun in early August 2006 and was completed around mid-September 2006. Tr. at 71.

According to Dr. Malkin, it was initially believed that sufficient monies would be generated to make the payments to PMC once Bassett opened a neurology center in Oneonta, New York. Tr. at 42. By memorandum, dated March 25, 2007, from Dr. Klamm and Nicoletta to Thomson, it was requested that the commencement "of our MRI lease with Philips" be postponed from November 1, 2006, to April 1, 2007 in order to give the Debtor some "breathing space" to stimulate referrals. *See* Debtor's Exhibit 12. The agreement was amended on or about April 1, 2007, to provide for sixty-six remaining payments, following the initial six months. *See* Debtor's Exhibit 2. Beginning April 1, 2007, the Debtor agreed to five monthly payments of $8,613.00 and sixty-one payments of $28,374.56. *Id.* The purchase price option was reduced from $175,000.00 to $145,000.00. *Id.*

In an e-mail from Dr. Klamm to K. Milner at PMC, mention is made of the fact that "the lease default with PMC had been cured and the default withdrawn. *See* Debtor's Exhibit 15. This was in response to an earlier e-mail of the same date from Milner to Dr. Klamm indicating PMC's receipt of two checks for $9,302.02,[4] which were to be applied to the February and March 2007 payments. *See* Debtor's Exhibit 14. As of May 10, 2007, it appears that the Debtor had not made the April and May 2007 payments. *See* Debtor's Exhibit 18.

On December 14, 2007, PMC commenced a replevin action in state court, seeking possession

---

[4] This amount is comprised of payment of $8,613, plus $689.04 in "SLS/Use Tax." *See* Debtor's Exhibit 18.

of the equipment, as well as damages, based on the Debtor's default in making the monthly payments ("State Court action").  At the evidentiary hearing, Dr. Malkin testified that the Debtor, after opening in October 2006, had been able to meet all its financial obligations except for the monthly payments to PMC.  In the State Court action, the parties negotiated a Stipulation and Order of Seizure, which was entered as an order, signed by Michael V. Coccoma, Justice of the New York Supreme Court for the County of Otsego, on April 11, 2008, granting the seizure motion filed by PMC.  *See* Exhibit C, attached to PMC's Motion for Relief from the Automatic Stay, filed July 25, 2008 (Dkt. No. 10-4).  In the Stipulation and Order of Seizure, the Debtor agreed that as of November 19, 2007, it owed PMC $1,753,581.69, plus interest and costs and expenses under the contract for the Achieva.  Under the terms of the Stipulation and Order of Seizure, the Debtor was allowed to temporarily remain in possession of the Achieva, *inter alia*, pending PMC's marketing efforts.  The Stipulation and Order of Seizure provided that upon 72 hours prior notice or request from PMC, the Debtor was to make the equipment available.  By letter dated July 17, 2008, PMC made a request that the equipment be turned over to it on July 21, 2008.  In response, the Debtor filed a voluntary petition pursuant to chapter 11 on July 21, 2008.

As of the date of the evidentiary hearing, the Debtor still had insufficient income to make the full payments to PMC.  Dr. Malkin testified that as of the hearing date only 110-120 MRIs were being performed on a monthly basis.  While the original intent had been to perform MRIs in connection with a neurology center to be opened by Bassett in Oneonta, that had not occurred despite Bassett having entered into a 15 year lease on a building owned by a company in which Dr. Malkin and Dr. Klamm are apparently members and where the Achieva is installed.  According to Dr. Malkin, the Debtor was investigating the possibility of offering breast MRIs to patients, which he estimated would result in an additional 700-800 MRIs per year.  Tr. at 43.  He also acknowledged

that to modify the Achieva for breast MRIs, the Debtor would need to have approximately

$200,000.00 in add-ons installed on the machine.  Tr. at 44.

# DISCUSSION

The Debtor has the burden of proof in demonstrating that the agreement with PMC is not a

true lease.  *In re Worldcom,* Inc., 339 B.R. 56, 62 (Bankr. S.D.N.Y. 2006); *In re Owen,* 221 B.R. 56,

60 (Bankr. N.D.N.Y. 1998); *In re Murray,* 191 B.R. 309, 315 (Bankr. E.D. Pa. 1996), *aff'd* 201 B.R.

381 (E.D.Pa. 1996).    Initially, the Court notes that the determination of whether a contractual

agreement is to be characterized as either a lease or security arrangement is a matter of state law.

*In re Gateway Ethanol,* LLC, 415 B.R. 486 (Bankr. D.Kan. 2009); *Worldcom*, 339 B.R. at 63.

Courts have recognized that whether an equipment lease is to be treated as a "true lease" or an

installment sales contract/security agreement "is one of the most vexatious and oft-litigated issues

under the Uniform Commercial Code." *In re QDS Components, Inc.*, 292 B.R. 313, 323 (Bankr. S.D.

Ohio 2002) (citations omitted). As a result, the case law is comprised of "a disjointed patchwork of

decisions that simply cannot be reconciled." *Id.* at 329.

In this case, the agreement is governed by the laws of the Commonwealth of Pennsylvania.

Pennsylvania's Uniform Commercial Code, as of 2006, provides as follows:

§ 1201(5).    DETERMINATION OF LEASE OR SECURITY INTEREST. –
Whether a transaction creates a lease or security interest is determined by the facts
of each case; however:

(i) A transaction creates a security interest if the consideration the lessee is to pay the
lessor for the right to possession and use of the goods is an obligation for the term
of the lease not subject to termination by the lessee and:

(A) the original term of the lease is equal to or greater than the remaining
economic life of the goods;

(B) the lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods;

(C) the lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement; or

(D) the lessee has an option to become the owner of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement.

(ii) A transaction does not create a security interest merely because it provides that:

(A) the present value of the consideration the lessee is obligated to pay the lessor for the right to possession and use of the goods is substantially equal to or is greater than the fair market value of the goods at the time the lease is entered into;

(B) the lessee assumes risk of loss of the goods, or agrees to pay taxes, insurance, filing, recording, or registration fees, or service or maintenance costs with respect to the goods;

(C) the lessee has an option to renew the lease or to become the owner of the goods;

(D) the lessee has an option to renew the lease for a fixed rent that is equal to or greater than the reasonably predictable fair market rent for the use of the goods for the term of the renewal at the time the option is to be performed; or

(E) the lessee has an option to become the owner of the goods for a fixed price that is equal to or greater than the reasonably predictable fair market value of the goods at the time the option is to be performed.

***

(iii) For purposes of determining whether the transaction is a lease or a security interest:

(A) Additional consideration is not nominal if:

(I) when the option to renew the lease is granted to the lessee, the rent is stated to be the fair market rent for the use of the goods for the term of the renewal determined at the time the option is to be performed; or

(II) when the option to become the owner of the goods is granted to the lessee, the price is stated to be the fair market value of the goods determined at the time the option is to be performed

Additional consideration is nominal if it is less than the lessee's reasonably predictable cost of performing under the lease agreement if the option is not exercised.

(B) "Reasonably predictable" and "remaining economic life of the goods" are to be determined with reference to the facts and circumstances at the time the transaction is entered into.

13 Pa. C.S.A. § 1201(5) (2006).[5]

As discussed by the court in *Gateway Ethanol*,

"The hallmark of a lease is that it grants the lessee the right to use property for a period less than its economic life with the concomitant obligation to return the property to the lessor while it retains some substantial economic life." (quoting *QDS Components*, 292 B.R. at 322). In other words, "the lessor retains an economically meaningful residual interest in the leased property." (quoting *QDS Components,* 292 B.R. at 331). The 1987 revision of the UCC eliminated reference to the intent of the parties to create a lease or security, which had been in the prior version of the UCC and led to unfortunate results, and changed the focus to the economics of the transaction (footnote omitted). It reasserted the "significance of residual value as the touchstone of the common law definition of a true lease." (quoting *QDS Components*, 292 B.R. at 331).

*Gateway Ethanol*, 415 B.R. at 499; *see also In re Marhoefer Packing Co.*, 674 F.2d 1139, 1145 (7th Cir. 1982) (indicating that "[a]n essential characteristic of a true lease is that there be something of value to return to the lessor after the term. Where the term of the lease is substantially equal to the life of the leased property such that there will be nothing of value to return at the end of the lease, the transaction is in essence a sale"); *In re APB Online, Inc.*, 259 B.R. 812, 817 (Bankr. S.D.N.Y.

---

[5] Pa.C.S. § 1201(6), was first amended in 1992 to incorporate revised § 1-201(37) of Article 2A of the Uniform Commercial Code ("UCC"). As of 2006 when the agreement under consideration was executed, the statute had been renumbered as Pa.C.S. § 1201(5). Because the UCC is a uniform law, decisions from other state and federal courts interpreting UCC § 1-201(37), as revised in 1987, are relevant to the discussion herein. *See Murray*, 191 B.R. at 314.

2001) (observing that "when we speak of the intent to sell or lease, we mean the intent to convey the use of the property for its remaining useful life to the lessee, or alternatively, to vest a reversionary interest in the lessor at the end of the term").

In determining whether an agreement constitutes a true lease or a disguised security agreement requires a two-step analysis. *In re Phoenix Equip. Co., Inc.*, Case No. 08-13108, 2009 WL 3188684, *7 (Bankr. D.Ariz. Sept. 30, 2009). The first step involves the application of what has been called "the bright line test." *Id.*; *QDS Components*, 292 B.R. at 332. The first element concerns the Debtor's right to terminate the agreement during its six year term. The parties agree that the Debtor did not have an explicit right to terminate the agreement during said term.

It then falls on the Debtor to establish any one of what have been referred to as the "residual value factors," as set forth in 13 Pa. C.S.A. § 1201(5)(i)(A-D). *See id.; Owens*, 221 B.R. at 60-61. If one or more of the residual value factors is found to exist with respect to a non-terminable "lease" agreement, then it is a disguised security agreement as a matter of law. *QDS Components*, 292 B.R. 332, n.9; *see also Gateway Ethanol,* 415 B.R. at 499 (stating that "[i]f the lessee may not terminate the lease during its term and any one of the Residual Value Factors is present, the transaction is a sale without consideration of any other facts and circumstances"). Then, if it is found that the "bright line test" has not been satisfied by the Debtor, the Court must examine whether the instant creditor, PMC, retained a meaningful residual interest at the end of the lease term. *QDS Components*, 292 B.R. at 333.

In this case, the Debtor bases its arguments on the fourth residual value factor, namely whether it had the "option  to become the owner of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement." 13 Pa. C.S.A. § 1201(5)(i)(D). Under the statute, "(1) the option price is not nominal when the option to purchase

is stated in the agreement to be the fair market value of the property and (2) the option price is

nominal if it is less than the lessee's reasonably predictable costs of performing under the lease

agreement if the option is not exercised." *QDS Components*, 292 B.R. at 335.

In determining whether "additional consideration" is nominal, the Court is to examine the

economic realities of the transaction and the expectations of the parties concerning the projected

value of the equipment at the time they entered into the agreement, rather than the actual value at

the conclusion of the term. *Gateway Ethanol*, 415 B.R. at 500. In other words, "'[f]oresight not

hindsight controls.'" *Id.*, quoting James J. White & Robert S. Summers, *Uniform Commercial Code*,

vol 4, § 30-3(e) (5th ed. 2002 & 2008 Supp.); *see also QDS Components*, 292 B.R. at 340 (stating

"it is the parties' projections at the outset of a transaction of the expected fair market value of the

leased goods, their remaining economic life, if any, at lease end, and the cost of continued

performance under the lease agreement if the option is not exercised that must be examined"). It

has been suggested that the question to be answered in this regard is whether "'the option price is

so low that the lessee will certainly exercise it and will, in all plausible circumstances, leave no

meaningful reversion for the lessor.'" *Gateway Ethanol*, 415 B.R. at 500, quoting 4 White &

Summers, at § 30-3(e). In this regard, it is the Debtor's burden to establish what the original parties

to the transaction anticipated at the time they signed the agreement concerning the Debtor's cost of

performance, including the cost of deinstalling and returning the Achieva to PMC should it elect not

to exercise the purchase option.[6] *See Gateway Ethanol,* 415 B.R. at 501.

As set forth in the e-mail from Thomson on April 18, 2006 (Debtor's Exhibit 4), the price

of the Achieva at that time was $1,349,743.00. Hiney testified that the fixed price purchase option

---

[6] Because the agreement did not include an option to return the Achieva to PMC in exchange
for a more up-to-date model after six years, replacement cost is not to be considered by the Court
in determining nominality. *See Gateway Ethanol*, 415 B.R. at 502.

was originally $175,000.00 after 66 months or approximately 13% of the original cost. In comparison, he testified that the wholesale value of the Achieva, if returned by the Debtor after 66 months, "might have been 11 or 12 or 10" percent. This comports with his testimony that with respect to a fixed price purchase option, he set it higher than the projected wholesale value. According to Dr. Klamm, "everybody, Carmen Mazzotta and I and Dr. Malkin and the people I talked to, agreed that the equipment at the end of a 66-month term would be worth substantially more than $175,000.00. Tr. at 84. When asked on cross-examination to explain his basis for that statement, he stated that at the time he had talked with people in the business. In addition, based on his almost 30 years experience in the medical business, he stated that "I had a rule of thumb for this quality equipment to be worth at the end of a 50 - a 66 month lease - to be worth anywhere between 20 and 30 percent of its original value."[7] Tr. at 85. This view was also supported by Pinardi's testimony that for a high end unit such as the Achieva, a 10 percent residual value was a "bargain." It also comports with Hiney's testimony that the fair market value of the Achieva was estimated to be 22.5% of the original cost or $328,742.00 after 66 months.

In addition, the cost to remove the equipment and return it to PMC is also relevant to any nominality determination. *Gateway Ethanol*, 415 B.R. at 501. Pinardi estimated the cost to be between $10,000.00 and $15,000.00, generally, for removal of similar equipment, while acknowledging that depending on its location in the building, it might cost as much as $21,000.00. Tr. at 27. He also estimated the shipping costs to be between $3,000 and $5,000.00. *Id.* These estimates were for removal and shipping in 2009. There was no testimony indicating the estimated cost in 2006 when the negotiations and subsequent agreement were finalized. However, it appears

---

[7]    Twenty-five percent (the mid-point of 20-30%) of $1,349,743.00 calculates to be $337,435.75.

18

that it was significantly lower than the original purchase option price of $175,000.00.

Ultimately, the Court must compare the option price amount with the expected value of the Achieva at the time the option was to be exercised as anticipated at the time of the agreement. *Gateway Ethanol*, 415 B.R. at 502.  "The test is what the lessee would be required to expend to retain the leased goods, not what it would give up if it were returned."  *Id.* at 503.  As noted by the court in *Gateway Ethanol*, at least one leading authority has indicated that "any option price above 50% of the predicted fair market value should be accepted as not nominal."  *Id.* at 502, n.52, citing 4 Wright & Summers, at § 30-3(e).  If the Court were to apply this 50% standard, it is clear that the purchase price of $175,000.00 after 66 months was not nominal based on an estimated fair market value of $328,742.00 after the same 66 months.  Based on the evidence presented by the Debtor, the Court is unable to conclude that the anticipated cost to the Debtor to exercise its option to purchase the Achieva is nominal, as the term is defined in the controlling statute.

That being said, the Court analysis must then focus on whether PMC retained some meaningful economic interest in the residual such that the agreement constituted a lease. Admittedly, because the UCC does not provide a definition of "meaningful reversionary interest," courts have examined a number of economic factors in their analysis of whether the original agreement left the lessor with some meaningful economic interest in the residual such that the agreement should be deemed a true lease when executed, rather than a sale.

The court in *Gateway Ethanol* declined to apply factors examined in cases rendered prior to the 1987 amendments to the UCC.  *See, e.g., In re Marhoefer Packing Co., Inc.*, 674 F.2d 1139 (7th Cir. 1982).[8]  Instead, it opted to examined the economic factors in the agreement under consideration

_____

[8]  The court in *Gateway Ethanol* pointed out that the court in *In re Taylor*, 209 B.R. 482 (Bankr. S.D. Ill. 1997), relying on *Marhoefer Packing*, identified several factors it considered relevant, including "'(1) whether the lessee has the option to renew the lease or to become the owner

19

including (1) the anticipated useful life of the equipment;[9] (2) the ability of the lessor to market the

equipment at the end of the lease term; (3) the amount of the lease payments over the term of the

contract in relation to the initial value of the equipment; (4) whether the equipment is unique

because it was designed for installation in the debtor's facility; (5) whether at the time of the

agreement the long term operation of the debtor's facility required its continued possession of the

equipment; and (6) the economic benefit to the debtor in having the transaction structured as a lease

rather than a sale. *Gateway Ethanol*, 415 B.R. at 505.

With respect to the first factor, Hiney testified that according to the American Hospital

Association, the useful life of MRIs was estimated to be five years. However, he indicated that most

people in the industry view that as "ridiculous." Tr. at 112. It was his opinion that MRIs that are

eight or ten years old have "some material economic value." *Id.*

As to the ability of the lessor to market the equipment at the end of the lease term, Pinardi

testified that a machine such as the Achieva would, in his view, "bring [a] 20 percent or better

residual" at the end of five years. Tr. at 23. According to Pinardi, at the time of the hearing there

were two Achieva's on the market, including a 2007 16 channel model for which the asking price

was $565,000.00. Dr. Klamm also testified that if the Debtor had opted to purchase the machine

after 66 months for $175,000.00, it would be able to sell it for a profit should it elect not to retain

it for its own use. Tr. at 96; *see also* Debtor's Exhibit 1, showing the amounts for which various

MRI scanners had been sold when they had been returned to PMC after 58 to 75 months.

---

of the property; (2) whether the amount of rent exceeds the fair market value of the property; (3)
whether the debtor is responsible for the payment of taxes, insurance and other costs incident to
ownership; and (4) whether the useful lie of the property exceeds the length of the term of the
lease.'" *See Gateway Ethanol*, 415 B.R. at 504 (quoting *Taylor*, 209 B.R. at 487).

[9] "Useful life" is defined as "[t]he estimated length of time that depreciable property will
generate income." BLACK'S LAW DICTIONARY 1683 (9th ed. 2009).

As for the third factor, the Court notes that after the initial six months, the agreement was amended on or about April 1, 2007, to provide for five monthly payments of interest only of $8,613.00 and sixty-one payments of $28,374.56, with a reduction in purchase price of $145,000.00. *See* Debtor's Exhibit 2.  The evidence also indicates that the Debtor made two payments to PMC of $8,613.00, exclusive of sales tax, to be applied to February and March 2007.  The Court calculates payments of $60,291.00 in interest only payments over seven months and payments of $1,730,848.10, including both interest and principal, over the remaining sixty-one months. Excluding the payment of interest over the sixty-one months in the sum of $525,393.00, the Court calculates payments on principal of $1,205,455.10.  The difference between the original price of the equipment, namely $1,349,743.00, and the $1,205,455.10 in principal payments under the agreement, as amended, equals $144,287.90, the approximate purchase price option for the Achieva at the end of the contract.

With respect to the fourth and fifth factors, it is clear, based on the testimony, that the Achieva was not specially designed for installation at the Debtor's facility in Oneonta, New York. As far as whether the operation of the Debtor's facility required its continued possession of the Achieva, it is just as clear that in order to provide magnetic resonance imaging of patients, possession of the Achieva, or some other comparable MRI equipment, is critical to its continued operation.[10]

---

[10]  The Court has reviewed the most recent Operating Reports of the Debtor for the months following the submission date for this Decision, including September, October and November 2009 (Dkt. No. 141, 142 and 132, respectively).  They show receipts of $30,000.00 for September and October and receipts totaling $140,000.00 for November.  Included in the monthly statements of cash flow is an allocation of $5,000.00 to PMC, which the Court understands has been escrowed by the Debtor each month beginning in at least July 2009 (Dkt. No. 139).  Net cash flow in September was a negative $3,569.27; for October a negative  $14,816.20, and for November a positive $110,375.78.  Whether or not this positive cash flow will continue, the Court has obvious concerns about the Debtor's ability to make the payments to PMC based on its overall receipts for the past

While there was testimony by both Dr. Klamm and Hiney concerning the structuring of the agreement, there is no evidence or testimony concerning the advantage or disadvantage to the Debtor of entering into a lease versus a sale of the Achieva in 2006 from the standpoint of tax benefits or the ability to attract capital investors.  Accordingly, the Court is unable to make any finding with respect to the sixth factor.

The Court concludes that the Debtor has not met its burden of establishing that the agreement between it and PMC is anything but what it is labeled, namely a lease.  The Debtor has not established that the purchase price option of either $175,000.00 or $145,000.00 is nominal based on what the original parties to the transaction anticipated.  Nor has the Debtor established that PMC's reversionary interest in the Achieva upon its return is insignificant.  The Court finds further support for its conclusion in the decision of the State Court to grant PMC's seizure motion, giving the Debtor only temporary possession of the Achieva until PMC was able to successfully market the equipment.

Based on the foregoing, it is hereby

ORDERED that the Debtor's request for a determination that the contract between it and PMC, as discussed herein, constitutes a secured transaction is denied; it is further

ORDERED that the Debtor's motion pursuant to Code § 365(d)(5) (Motion 1) insofar as it seeks to have the Court modify the requirement of timely performance of the Debtor's obligations under the lease arising 60 days after the order for relief in the case based on the equities of the Debtor's case (Motion 1) (Dkt. No. 35) be returned to the calendar to be heard on Thursday, January 14, 2010, at 10:00 a.m. in Utica, New York; and it is finally

ORDERED that PMC's motion (Motion 2) seeking an order compelling the timely

---

six months, including no receipts in either July or August 2009 (Dkt. Nos. 139 and 140).

22

performance by the Debtor of "all obligations under a certain lease agreement, to compel Debtor to assume or reject a certain lease agreement, for relief from the automatic stay, for adequate protection and for payment of administrative expenses; or in the alternative for conversion of the case to a chapter 7 proceeding." ("Motion 2") (Dkt. No. 82) be returned to the calendar to be heard on Thursday, January 14, 2010, at 10:00 a.m. in Utica, New York.

Dated at Utica, New York
this 12th day of January 2010


/s/ Diane Davis
DIANE DAVIS
U.S. Bankruptcy Judge